## Díaz v. Torres.

### Appeal from the District Court of San Juan.

No. 526.—Decided April 28, 1911.

Appeal—Finding on the Evidence—Manifest Error.—In cases where the court below has committed manifest error in its finding on the evidence the judgment appealed from must be reversed, and the circumstance that all the evidence taken before the lower court was not included in the statement of facts does not constitute a bar to such reversal, for in order to do so it would have to be shown that the evidence omitted is necessary to enable the court to place itself in a position similar to that of the lower court when considering the evidence.

Divorce—Adultery—Reconciliation.—The mere forgiveness of the wrong is not sufficient for the purpose of concluding that there has been a reconciliation between the parties. It is necessary that the union be continued and the conjugal rights reestablished in such a manner as to reinstate the guilty party in the position he or she occupied before the commission of the offense.

Id.—Considering the circumstances of this case it is not possible to admit as sufficient evidence for the purpose of establishing the existence of the reconciliation the declaration made by the wife in her testimony, contradicted by the husband, to the effect that both had had carnal intercourse after the facts determining the infidelity.

Id.—Intervention of the District Attorney—Appeal.—The plea that the district attorney had no intervention in the trial cannot be urged where, after rendition of the judgment, notice of the appeal had been served upon him, and he had requested in his brief that the judgment appealed from be sustained, without alleging the nullity of the trial on the ground that he had had no intervention therein, for, if such defect did exist, it was cured by the consent of said district attorney, who is the party interested, it being idle to discuss whether in cases of divorce the district attorney should have a greater intervention than that assigned the *fiscal* under rule 4 of the Rules of the Supreme Court.

The facts are stated in the opinion.

*Messrs. Bosch & Soto* for appellant.

*Mr. Sandalio Torres Monge* for respondent.

*Mr. Jesús M. Rossy, fiscal,* for The People.

Mr. Chief Justice Hernández delivered the opinion of the court.

Under date of November 30, 1909, Pedro Díaz Correa filed an amended complaint in the District Court of San Juan against Mercedes Torres Reyes, praying that the matrimonial bond existing between them by virtue of their marriage on August 1, 1904, be adjudged dissolved, the children had during said marriage, namely, Mercedes, Celia América, and Dolores, of 5, 3, and 1½ years, respectively, to be left under the custody and parental authority of the plaintiff.

As fundamental facts of the complaint the plaintiff alleges that six months prior to the filing of the complaint he had begun to observe in the conduct of his wife something that excited his suspicion, and had afterward occasion to convince himself that she was sustaining amorous relations with a certain Luis Alvarez, and had proved unfaithful to him by voluntarily and maliciously having sexual intercourse with said person.

In her answer to the complaint Mercedes Torres Reyes admitted the existence of her marriage to the plaintiff and the birth of the children had therefrom, but denied the fundamental facts of the complaint and alleged that, even assuming that they were true, the action for divorce had been entirely extinguished through the conciliation of the parties, for subsequently to these acts the couple had lived under the same roof until October 25, 1909, when the defendant, with the consent of her husband, had moved with her children to the house of her mother, so that he might go to Spain and take the baths of Archema, they having slept together the preceding night (October 24), and the plaintiff had subsequently gone to the house of the defendant's mother, where he had given her $7.50 for the support of herself and the children until the 10th of the following November.

The defendant, furthermore, filed a counterclaim praying that the marriage bond be adjudged dissolved, the children remaining under the custody and parental authority of their mother, she basing said request on the ill-treatment and serious affronts she had received at the hands of her hus-

band, who had gone so far as to infect her with diseases of
a syphilitic character, and ended by outraging her womanly
honor and her dignity as a wife and mother through the false
and slanderous imputation made against her in the complaint.

The trial having been held, the court, on January 3, 1910,
rendered judgment couched in the following terms:

"On December 8, 1909, in open court, this case was called up for
a hearing in the order in which it was placed upon the docket, when
both parties appeared through their attorneys and announced that
they were ready. The party plaintiff produced his evidence which
was taken, as was also that of the defendant, both in support and
rebuttal of the complaint and counterclaim, respectively, the case
being continued on that day until the testimony of the witness, Dr.
Clemente Fernández, of Carolina, could be taken, for which purpose
the court set December 20, 1909, as also in order to carry out an
ocular inspection of certain places, as proposed by the parties. ·

"On December 20, the court repaired to the town of Carolina,
and after taking the testimony of said Dr. Fernández and effecting
the ocular inspection, the trial was announced as terminated and
ready for judgment.

"And the court after duly considering the case, for the reasons
set forth in an opinion given separately, decides to render, and does
render, judgment dismissing both the complaint and the counter-
claim, and ordering that the children had by this marriage be left in
charge of the mother, namely, Mercedes Reyes Torres, until further
order of this court, with costs taxed against the plaintiff." .

From the foregoing judgment the plaintiff took an appeal
to this Supreme Court, alleging that inasmuch as the con-
summation of the adultery had been proven, and it was not
shown that there had been any conciliation between the
spouses, the complaint should have been sustained under sec-
tion 164, paragraph 1, of the Revised Civil Code, according
to which adultery on the part of either of the parties to the
marriage is cause for divorce.

Thus, then, the appeal is based on error in the considera-
tion of the evidence taken at the trial.

Let us see what the witnesses say who at the instance of
the plaintiff testified at the trial.

Monserrate Comas, some time in October, 1909, in his capacity as Insular policeman, had made some investigations regarding Mercedes Torres on the occasion of her being accused of adultery, because she was seen to enter a photographic gallery with a young shoemaker of Río Piedras, in whose company she was afterwards seen in San Francisco Street, this city.

Juan B. Zalduondo, another Insular policeman, one day between 4 and 5 a. m., while watching Pedro Díaz's house and yard and adjoining premises, he saw a man enter the courtyard of aforesaid house whom he supposed to be the plaintiff; but two or three days later, he having been commissioned by his chief to ascertain the facts about the adultery of Mercedes Torres with Luis Alvarez, upon being shown the latter he recognized him as the person he had seen jump over the fence of Pedro Díaz's house.

Juan de los Santos Calderón and Gregorio Rivera, one night in October of the year 1909, while leaving the town of Río Piedras on their way to the country, saw Mercedes Torres and Luis Alvarez coming out of the coach house of Enrique Vizcarrondo.

José Valentín Berríos, a relative of Pedro Díaz Correa, has seen Mercedes Torres and Luis Alvarez at different hours of the day walking through the streets of San Juan; and in an interview had with Alvarez, who is a nephew of Pedro Díaz, he told him that it was his duty to give no occasion for the rumors that were rife about him and Mercedes Torres.

Ramón López, one night at about 9.30 o'clock, saw Mercedes Torres and Luis Alvarez promenading on the *plaza* of Río Piedras accompanied by a little girl whom Mercedes was leading by the hand.

Leoncio Rodríguez has several times seen Luis Alvarez enter the house of Mercedes Torres, and on July 20, 1909, while Pedro Díaz was absent, he saw Alvarez and Mercedes come in from the street, the former entering one of the rooms followed by Mercedes.

Fernando Sovejano and Jesús Velilla, on October 17, 1909, between 10 and 11 p. m., saw Mercedes Torres coming out of the house of the shoemaker, Luis Alvarez, and having followed her at a distance of some 15 or 20 paces they saw her go into the house of Pedro Díaz Correa; and the said Velilla, on another occasion, at about 9 or 9.30 p. m., saw Mercedes and Luis Alvarez under the arch of the steps of the Normal building of Río. Piedras, he lying on top of her executing carnal acts.

Ramón Piñeiro, four or five months prior to the holding of the trial, at about 9 or 9.30 p. m., while returning to Río Piedras from *barrio* Río, met a little girl some 4 or 5 years of age sitting on the breastwork of the bridge, while Mercedes Torres and the shoemaker, Luis Alvarez, were sitting under said bridge; and another night at about 7 o'clock, he saw the same little girl playing on the grass and the aforesaid Luis Alvarez and Mercedes Torres sitting on the bench which stands on the way to the headquarters of the Insular police in Río Piedras.

Luis Pérez, one night in the early part of October, 1909, between 7 and 7.30, saw Mercedes and the shoemaker, Alvarez, talking together while they stood under a mango tree on Solís' plantation in Río Piedras.

Francisco Piñeiro, on that same night and before Pérez had seen her, saw Mercedes and Alvarez under the same mango tree, one on top of the other.

And, lastly, Juan Díaz Correa, a brother of the plaintiff, at about 2 o'clock in the evening of September 27, 1909, went to the store of Pedro Díaz Correa for the purpose of making a payment, and as Díaz was not there he proceeded to the parlor of the house and found Luis Alvarez in bed with Mercedes Torres, he jumping out of a window, of which the witness apprised his brother in order that he might take proper action.

In rebuttal of these declarations tending to prove the

ground of the complaint, namely, the adultery of the defendant, what proofs have been produced by the latter?

These proofs consisted of the testimony of Maximiliano Torres, Pedro Díaz Correa, Mercedes Torres, Demetrio López, Juan López Sicardó, Benito Rivera, and José Valentín Berrios.

As testified by Maximiliano Torres, a brother of Mercedes, on October 14, 1909, in response to a telephone call, he went to Río Piedras at night and there he was informed by his brother-in-law, Pedro Díaz, that he wished to go to Archema and wanted Mercedes and the children to remain at the house of the witness, and, in fact, they did come over with a maid servant on the 15th of October aforesaid.

Pedro Díaz Correa states that the night Maximilano Torres was at his house they talked about the divorce suit he intended to bring against Mercedes Torres, as he had proofs of her having committed adultery; that he had defrayed the expenses of the conjugal household up to October 25, when Mercedes left the house, taking with her some of the furniture; that his brother, Juan Díaz Correa, had, on September 27, spoken to him about his wife's infidelity, but he thought that what his brother had revealed was not sufficient evidence for the purpose of instituting divorce proceedings, and both for this reason and because he had reported the case to the police so that guardsmen might be able to testify, he continued to live with the defendant and the children up to October 25; that he had been to the house of the mother of Mercedes Torres, to whom he had given $7.50 for her expenses and those of the children during 15 days; that at the time he was testifying six or seven months had elapsed without his having had any sexual contact with his wife, whom he had never maltreated, although she had gone to the doctors in quest of certificates anent imagined outrages; that he had never consented to live again with his wife, although she had proposed to let by-gones be by-gones and that they be reconciled—a reconciliation which her brothers had

also proposed to no purpose; that Alvarez, for a period of two months, more or less, had taken his meals at his house, but noticing that he conversed a great deal with Mercedes he ordered him to leave the house and to make his visits "scarce," which he took as an offense; and that he had afterwards received two anonymous letters with reference to the matter, which he destroyed because Mercedes and her family had told him that they were slanderous.

Mercedes Torres said that up to October 25 she had lived under the same roof with her husband, Pedro Díaz, and had had sexual intercourse with him the preceding night; that from the first days of her marriage Pedro Díaz had begun to ill-treat her; and three months later Dr. Fernández had detected a syphilitic disease she had caught from her husband; and she tells of the quarrels, insults, and outrages of which she was the victim during her marriage.

Demetrio López, janitor of the Normal School of Río Piedras, where he was on duty from 9.30 a. m. to 5.30 p. m., did not see Mercedes Torres in the vicinity of the building during the month of October, nor has he noticed anything extraordinary there.

In the estimation of Juan López Sicardó, Mercedes Torres was a virtuous woman.

Benito Rivera bought of Pedro Díaz the latter's commercial establishment on October 11 or 12, 1909, and both the plaintiff and defendant continued to live in the same house 12 or 14 days after that.

José Valentín Berríos' friendship with the Díaz family had been interrupted in consequence of a bill the plaintiff owed him, in the settlement whereof young Luis Alvarez had intervened.

These declarations do not contradict nor destroy that part of the plaintiff's evidence bearing upon the adultery of Mercedes Torres, but only tend to show that her husband was jealous, that he maltreated her, and that up to October 25

they had lived together, and had had carnel intercourse on the preceding night.

The evidence of adultery cannot be more complete, and we are of the opinion that the court below has committed manifest error in failing to find that the conjugal infidelity of Mercedes Torres had been established.

It is true that according to section 38 of the Law of Evidence the credibility of witnesses may be questioned as provided under section 21, which determines that a witness is presumed to speak the truth, although this presumption may be repelled by the manner in which he testifies, by the character of his testimony, or by the evidence affecting his character for truth, honesty, or integrity, or his motives, or by contradictory evidence; while section 162 provides that the effect of evidence is not arbitrary, but to be exercised with legal discretion, and in subordination to the rules of evidence; the court or jury not being bound to decide in conformity with the declarations of any number of witnesses which do not produce conviction in its mind against a less number, or against a presumption or other evidence satisfying its mind.

In the present case we do not find that the witnesses of the plaintiff have been false in one part of their testimony, according to the third paragraph of section 162 aforesaid, nor that these witnesses while testifying have contradicted themselves, nor that they have testified of facts which they could not know of their own knowledge, nor that they had been actuated by selfish or unworthy motives, nor that their statements conflict with other evidence, nor that their veracity, honesty, and integrity have been assailed through proper evidence.

We admit that ordinarily acts of conjugal infidelity are not performed before witnesses, but that, on the contrary, the privacy of solitude is sought for their accomplishment, such acts being usually enveloped in the shadows of mystery. This, however, does not prevent a vehement passion from

obscuring reason and impelling the will to execute them in
the erroneous belief that they will not be witnessed, while
they are so in reality, as well might have happened in the
present case.

Acts of conjugal infidelity, though usually secret, are not
by their nature exempt from the scrutiny of the senses.

We observe that in the judgment appealed from it is stated
that the testimony of Dr. Clemente Fernández had been taken
in the town of Carolina and that the court had made an ocular
inspection of certain places, as proposed by both parties, but
the result of these proceedings does not appear in the record.
Such omission has not been a bar to our examination of all
the evidence included in the statement of the case, nor does it
prevent our reversing the judgment appealed from, regard-
less of the evidence omitted.

In deciding, on January 15, 1909, the case of *Francisco
Vargas* v. *A. Monroig e Hijos,* we said:

"There is a rule of law that before an appellate tribunal may
reverse a judgment based on the verdict of a jury, or where the
court is substituted for the jury, such appellate court must be in a
position of being able to pass upon all the facts that the trial court
had before it. This rule of law is applicable where the court below
has weighed the facts and based its definite judgment thereon. But in
any case it must be shown that evidence has been omitted and that
the omitted evidence is material or necessary to the case."

The record does not show that the testimony of the wit-
ness, Dr. Clemente Fernández, and the ocular inspection car-
ried out by the lower court are necessary to place us in the
position of the court below when weighing the evidence bear-
ing upon the adultery of the defendant. Nay, more; it seems
to us that the testimony of the witness, Dr. Clemente Fer-
nández, would have tended to establish the syphilitic disease
alluded to by the defendant in her testimony and that the
ocular inspection did not affect the consideration of the tes-
timony of the witnesses who testified upon carnal acts con-
stituting the adultery of the defendant; for nothing is said

thereon by the respondent while contesting in her brief the probatory force of said testimony which, of itself, is not at all improbable, nor is it in conflict with other evidence, nor was it given by witnesses whose veracity, honesty, and integrity were questioned, as stated before.

In the judge's opinion, which the respondent inserts in her brief, the witnesses are not denied credence on account of the inspection carried out by the judge, but because of the character of the testimony and of the fact that the plaintiff and defendant had continued to live under the same roof. The words of the judge were as follows:

"In the present case the character of the testimony of the plaintiff's witnesses has not impressed the court favorably. They have testified that they had seen the defendant in several places near the town of Río Piedras and at different hours of the night in the company of a certain resident of said town. It seems extraordinary that the defendant and her paramour (if he was her paramour) did not conceal themselves to satisfy their desires. A witness, who is a brother of the plaintiff, declares that he had seen the defendant committing acts of adultery on one of the last days of September, 1909, and further states that he had told the plaintiff about it. Even on the assumption that this testimony is true, it appears that the plaintiff and the defendant continued to live as husband and wife under the same roof for one month. Upon such ground an action for divorce cannot be sustained."

The character of the testimony of the witnesses cannot in the present case detract from the credit to which they are entitled, for the reasons already set forth. As to the fact that Pedro Díaz Correa continued to live with his wife after having been apprised of her infidelity through the revelation of his brother, Juan Díaz Correa, the plaintiff himself in his testimony explains the reason he had for it. But even were such reason inadmissible, the fact that both spouses continued to live together could never constitute evidence of there having been any conciliation between them, and in this connection we reproduce as applicable to the case at bar

what we said when deciding, on April 2, 1902, that of *Alberto Bravo* v. *Angélica Franco:*

"The evidence, taken together, is not of such nature as to convince the court that the appellant had forgiven the offense or that a conciliation had taken place, and the following doctrine should be borne in mind: 'Mere forgiveness of the wrong is not sufficient, but it must be followed by a reunion of the parties or a restoration of the offender to all marital rights.' (Am. and Eng. Ency. of Law.) Moreover, 'condonation means a blotting out of the offense imputed, so as to restore the offending party to the same position he or she occupied before the offense was committed. The term forgiveness, as it is commonly current in the English language, does not fully express the meaning of condonation. A party may forgive in the sense of not meaning to bear ill will, or not seeking to punish, without at all meaning to restore to the original position.' (Am. and Eng. Ency. of Law.) The Supreme Court of Spain in its judgment of June 23, 1874, in a criminal prosecution for adultery instituted by a husband against his wife gave expression to the following opinion: 'With respect to the appeal taken in the name of  *  *  * and the first ground thereof, the facts admitted as proven in the judgment appealed from, namely, the love letters exchanged between the defendants, their appointments and interviews at different places, especially at the public assignation house, establish, without leaving room for doubt, not only their illicit intercourse but the acts constituting adultery resulting from such relations. As regards the second ground, the fact that the defendant wife continued in her husband's apartment and accompanied him in his walks and to the theatre after she had been surprised with  *  *  *  does not imply acquiescence in her infidelity nor' forgiveness, much less in the present case in which he has filed a complaint and continued a party to the prosecution for the imposition of a penalty, and is still such in this appeal.' "

Under the circumstances of the case and considering the erroneous standpoint from which the judge of the lower court estimated the evidence of the plaintiff we cannot admit as sufficient proof of conciliation the declaration of the wife in her testimony, contradicted by the husband, that they had had sexual intercourse after the acts · determining the infidelity.

It has been pleaded by the respondent in contesting the appeal and praying the dismissal thereof that the district attorney should have intervened in the present action as a lawful and necessary party in cases of divorce.

Such plea is inopportune, for it should have been made at the proper time in the court below; but as after the rendition of the judgment the district attorney was served with notice of the appeal and has had intervention therein by requesting in his brief that the judgment appealed from be sustained; while he did not allege the nullity of the trial on the ground that it had been conducted in the court below without his intervention, we are of the opinion that if such defect existed it has been cured through the consent of the district attorney, who is the party interested. It is therefore idle to discuss whether the district attorney in cases of divorce should have more intervention than that assigned to the *fiscal* under rule 4 of the Rules of the Supreme Court.

It having been proven that the adultery was consummated and there having been no proof of a conciliation between the spouses, the judgment should be reversed as to the portion thereof from which the appeal was taken and the action for divorce sustained, with all the pronouncements prayed for in the complaint.

*Reversed.*

Justices MacLeary, Wolf, and del Toro concurred.

Mr. Justice Aldrey did not take part in the decision of this case.